# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

PNC BANK,
NATIONAL ASSOCIATION,

      Plaintiff,

v.                                  Case   No.:  8:08-cv-610-T-27TGW

BRANCH BANKING
AND TRUST COMPANY,

      Defendant.

_____/

## ORDER

    **BEFORE THE COURT** is Plaintiff's Motion for Partial Summary Judgment (Dkt. 37),  to
which Defendant has responded in opposition (Dkt. 45).  Upon consideration, Plaintiff's Motion for
Partial Summary Judgment (Dkt. 37) is DENIED.

### *Background*

    This lawsuit arises out of a loan participation agreement (the "Participation Agreement"[1])
between Colonial Bank, N.A. ("Colonial"), the predecessor-in-interest of Defendant Branch Banking
and  Trust  Company  ("BB&T"),  and  Mercantile  Mortgage  Corporation  ("Mercantile"),  the
predecessor-in-interest  of  Plaintiff  PNC  Bank,  National  Association  ("PNC").[2]   On  or  about

---

[1]  Dkt. 37-3.

[2]  Mercantile merged with PNC, with PNC assuming all rights and obligations of Mercantile (including Mercantile's
rights and obligations under the Participation Agreement).  *See* Compl. ¶ 1; Answer ¶ 1; Pretrial Statement (Dkt. 71)
§9(1); Dkt. 37 at 2-3; Dkt. 45 at 1; Dec. 11, 2008, Deposition of John D. Long ("Long Dep." [Dkt. 37-5]) at 30, 159.
"Mercantile" and "PNC" are used interchangeably in this Order.

November 8, 2005, Colonial and Mercantile entered into the Participation Agreement with respect to a construction loan (the "Loan") that Colonial agreed to make to The Hammocks Cape Haze, LLC ("Cape Haze") in a November 8, 2005, Amended and Restated Loan Agreement (the "Loan Agreement"[3]).[4]

The Loan was in the maximum principal amount of $34,864,174 and the proceeds were to be used to develop and construct multi-family dwellings (234 condominium units) in Southwest Florida at the Cape Haze project.[5] A portion of the Loan ("Tranche 1") was a non-revolving line of credit in the amount of $13,864,174.00 (of which Colonial had already made available approximately $8,975,000.000 to Cape Haze pursuant to an earlier loan) for the acquisition of land, installation of infrastructure, and construction of common amenities.[6] A second portion of the Loan ("Tranche 2") was a revolving line of credit in the amount of $21,000,000.00 for the construction of the project's "vertical improvements,"[7] that is, for construction of condominium units.[8] As a revolving line of credit, Tranche 2 allowed sums repaid under Tranche 2 to be re-advanced to the borrower, with the result that the Tranche 2 balance could fluctuate during the term of the Loan.[9] The Loan's maturity date was September 20, 2007.[10] The Loan is evidenced by a Note secured by a Guaranty Agreement

---

[3] Dkt. 37-4.

[4] Compl. (Dkt. 1) ¶ 5; Answer (Dkt. 33) ¶ 5.

[5] Compl. ¶ 6; Answer ¶ 6; Loan Agreement § 1.1(p).

[6] *See* Loan Agreement §§ 1.1(jj), 2.1(a).

[7] *See* Loan Agreement §§ 1.1(ll), 2.1(b).

[8] October 14, 2008 Deposition of Joseph E. Taggart ([Dkt. 37-6] "Taggart Dep.") at 14.

[9] *See* Loan Agreement § 2.1(b)(ii).

[10] *See* Loan Agreement § 1.1(v).

by Cape Haze's principals and a Mortgage and Security Agreement.[11]  Pursuant to the Participation

Agreement, Mercantile purchased a 42.6345% undivided ownership interest in the Loan and the

security.[12]  The Participation Agreement was executed on behalf of Mercantile by John D. Long,

Senior Vice President, and on behalf of Colonial by Joseph E. Taggart, Vice President.[13]  Taggart

also "originated" the Loan[14] and executed the Loan Agreement on behalf of Colonial.[15]  Cape Haze

eventually defaulted on the Loan.[16]

In the Participation Agreement, Colonial agreed to be the "lead" bank responsible for

collection, management, enforcement and administration of the Loan.[17]  Colonial was responsible

for collecting principal payments and remitting to Mercantile its share of the principal, interest, and

fees.[18]  Section 9 of the Participation Agreement, entitled "Management and Duty of Care," provides:

> Lender [Colonial] shall not be liable under this Agreement to Participant [Mercantile]
> for any action taken or omitted or for any error in judgment, except for Lender's
> material breach of this Agreement or its own gross negligence, bad faith or willful
> misconduct.  Participant acknowledges that Lender's obligations with respect to the
> Loan shall be no greater than the customary practices presently employed by Lender
> in administering and servicing other loans covering commercial properties.  Lender

---

[11]  Compl.  ¶ 6; Answer ¶ 6.

[12]  Compl. ¶ 7; Answer ¶ 7.

[13]  *See* Participation Agreement at 9.

[14]  Taggart Dep. at 18.

[15]  Loan Agreement at 39.

[16]  Pretrial Statement § 9(22).

[17]  *See* Participation Agreement § 9; Pretrial Statement § 9(18).

[18]  *See* Participation Agreement § 11; Pretrial Statement § 9(19).

shall, subject to the provisions of this Agreement, retain all rights with respect to enforcement, collection, [and] administration of the Loan and the Loan Documents.[19]

Section 16 of the Participation Agreement, entitled "Express Restrictions," provides that Colonial may not, without Mercantile's prior written consent (not to be unreasonably withheld):

> a.      In any material respect, make or consent to any release, settlement, compromise, indulgence, substitution, renewal, extension, modification or other alteration in any of the material obligations, covenants or agreements of the Borrower, Guarantor or any other person under any of the Loan Documents . . .  or
>
> g.      Release any security for the Loan other than releases made in connection with the sale of units to third party purchasers, or substitute or exchange any such security with security not of approximately equal value.[20]

The Participation Agreement further provides: "[I]n the event Lender [Colonial] decides to terminate its credit relationship with a Borrower, or materially downgrades its relationship with a Borrower, Lender [Colonial] promptly will provide written notice of such determination to Participant."[21]

Section 2.1(a)(ii) of the Loan Agreement, regarding Tranche 1 funding, provides:

> The principal amount disbursed under Tranche 1 shall not exceed the lesser of (A) seventy-five percent (75%) of the appraised value of the Property, as improved with the Tranche 1 Improvements, as determined by Lender in its sole discretion, or (B) ninety percent (90%) of the costs of acquisition of the Property and completion of the Tranche 1 Improvements, as determined by Lender in its sole discretion.[22]

Section 2.1(b)(iii) of the Loan Agreement, regarding Tranche 2 funding, provides that, before the Lender makes any advance under Tranche 2 for the construction of any building, "Borrower must

---

[19]  Participation Agreement § 9.

[20]  Participation Agreement § 16.

[21]  Participation Agreement § 7; *cf.* Participation Agreement § 18.

[22]  Loan Agreement § 2.1(a)(ii).

deliver to Lender . . . Qualified Sales Contracts for no less than fifty percent (50%) of the Units in the building."[23] Section 2.1(b)(iii) further provides:

> Lender will fund up to, but not to exceed, $12,821.00 per Unit over the term of this Agreement in order to satisfy pre-paid brokerage commissions and marketing fees related to the project. The total funds advanced under Tranche 2 with respect to any building shall not exceed the lesser of:
>
> (A)    Eighty percent (80%) of the budgeted costs for vertical construction of the applicable building (excluding $12,821.00 per Unit in brokerage commissions and marketing fees paid up front at Closing), as reflected on the Budget;
>
> (B)    Seventy-five percent (75%) of the value of the applicable building as determined pursuant to an updated Lender-approved MAI[24] appraisal (less the $59,249.00 per Unit allocated to Tranche 1, and also less the $12,821.00 per Unit brokerage fee); or
>
> (C)    $859,280.00 per "Type A" building, $1,895,000.00 per "Type B" building, or $3,117,625.00 per "Type C" building.[25]

The Loan Agreement further provides: "In no event shall Borrower have in excess of ninety-two (92) Units under construction at any one time without Lender's prior written consent."[26]

Section 2.7 of the Loan Agreement requires Colonial to release from the mortgage lien any condominium unit sold pursuant to a qualified sales contract,

> provided, however, that . . . Borrower shall pay to Lender, as part of the sale of any such Unit, a release price (the "**Release Price**") equal to the greater of (i) ninety percent (90%) of the gross list price of the applicable Unit, or (ii) one hundred percent (100%) of the Net Proceeds . . . resulting from the sale of the applicable Unit; but in no event less than one hundred twenty-five percent (125%) of the amount of the Loan funds used for the construction of the Unit (including an appropriate

---

[23] Loan Agreement § 2.1(b)(iii)(2).

[24] *See* Feb. 27, 2009, Deposition of Woodward S. Hanson ([Dkt. 47-2] "Hanson Dep.") at 9 (explaining that MAI means "Member of the Appraisal Institute.").

[25] Loan Agreement § 2.1(b)(iii)(4).

[26] Loan Agreement § 2.1(b)(iii)(5).

allocation of Loan funds used for land acquisition, infrastructure and common amenities, as determined in Lender's sole, but reasonable discretion).[27]

Section 2.7 further provides:

> Upon receipt of any Release Price, Lender shall apply such payment to the outstanding balances of Tranche 1 and Tranche 2 as follows: (i) one hundred percent (100%) of the Tranche 2 amount allocated to the construction of the applicable Unit plus Twelve Thousand Eight Hundred Twenty-One Dollars ($12,821.00) per Unit shall be applied to the principal balance of Tranche 2, and (ii) the balance of the Release Price shall be applied to the principal balance of Tranche 1, but in no event less than Seventy-Four Thousand Sixty Dollars per Unit ($74,060.00).[28]

As a condition to the Loan, Cape Haze executed a "Reserve Agreement"[29] that required Cape Haze to establish and maintain, as additional security for the Loan, a construction reserve (the "Reserve") in the amount of $2.5 million (which could be reduced to $1 million on the repayment of Tranche 1).[30]

The Reserve Agreement provides that the Reserve "shall be held and disbursed or released by Lender [Colonial] strictly in accordance with the terms of this Agreement,"[31] and the Reserve Agreement states that the Reserve is established to provide funds for the following purposes:

> (i)     For payment of costs and expenses incurred by Borrower in connection with the performance of the work to the Project to complete or correct the work of unbonded subcontractors (collectively, the **Additional Construction Work**"); and

---

[27]  Loan Agreement § 2.7.

[28]  Loan Agreement § 2.7.

[29]  Dkt. 37-12.

[30]  Reserve Agreement § 3.

[31]  Reserve Agreement § 3(b).

(ii)    For payment of increased Construction Costs beyond what is provided for in the Budget ("**Cost Increases**").[32]

The Reserve Agreement further provides that the Lender may "disburse to Borrower the amount paid or incurred for the Additional Construction Work and/or the Cost Increases" and that disbursements of the Reserve are subject to "the terms and conditions of the Loan Agreement relating to Advances."[33]

An August 13, 2007, "Change in Risk Grade Memorandum"[34] records Colonial's decision to downgrade the credit rating of the Cape Haze Loan from a score of six (used by Colonial for "loans that have a potential weakness"[35]) to seven (used by Colonial for loans that are "below the credit standards of the bank"[36]).[37]  The drafter[38] states that: (a) of 160 units built, 146 were presold and the remaining "14 . . . were to be spec.";[39] (b) 100 sales had closed; (c) 21 units remained under contract; and (d) "25 units fell out."[40]  The drafter further states that no additional sales had occurred "over the last six to nine months" and that an estimated 140 closings were required to repay the

---

[32]  Reserve Agreement § 3(b)(i)-(ii).

[33]  Reserve Agreement § 3(b).

[34]  Taggart Dep. Ex. 26 (Dkt. 93-27).

[35]  Oct. 15, 2008, Deposition of James L. Hogan ([Dkt. 37-7] "Hogan Dep.") at 26.

[36]  Hogan Dep. at 25.

[37]  Change in Risk Grade Memorandum.

[38]  No signature appears above the printed signature line, which reads "Joseph Taggart: Real Estate Lending Officer." Taggart stated that he had no recollection of the document.  Taggart Dep. at 147-48.

[39]  *See* Hanson Dep. at 87 (agreeing that, in the construction industry, "if somebody buys a . . . lot and builds a house on it without a prospective buyer, that in the marketplace is termed a 'spec house.'"); Hanson Dep. at 88 ("Q; 'And . . . the speculation is that a buyer would be found after the home is completed; is that correct?' A: 'Or during the process of construction.'").

[40]  Change in Risk Grade Memorandum.

Loan.[41]  Based on these facts, uncertainties in the current real estate market (especially in Charlotte

County), and the risk "associated with effectively marketing the project," the drafter recommends

the downgrade.[42]  Colonial's credit manager, senior lender, and credit review manager concurred.[43]

James Hogan, Colonial's Senior Credit Officer for Florida, stated that, when Colonial entered

the lending relationship with Cape Haze, Cape Haze probably had a credit rating of four or five.[44]

(At Colonial, a credit rating of five "is considered a pass credit."[45])  Additionally, a Colonial "Loan

Approval Report/Request" attached to Plaintiff's motion (but not authenticated), indicates that in

April or May, 2005, Colonial assigned a grade of three to an "A&D loan" that ultimately became

Tranche 1 of the Loan.[46]  Hogan testified that, if the credit rating of Cape Haze had been a six or

seven when the Loan was proposed, Colonial would have declined the transaction.[47]  Hogan also

described a downgrade from four to a six or seven as a material downgrade in credit rating[48] and

agreed that, from the beginning to the end of the relationship with Cape Haze, "there was a material

downgrade in Colonial's credit rating on Cape Haze."[49]

---

[41]  Change in Risk Grade Memorandum.

[42]  Change in Risk Grade Memorandum.

[43]  Change in Risk Grade Memorandum.

[44]  Hogan Dep. at 99-100.

[45]  Hogan Dep. at 26.  These credit scores or "grades" are based on Colonial's own internal rating system.  *See* Hogan Dep. at 27.

[46]  Dkt. 37-16.

[47]  Hogan Dep. at 99.

[48]  Hogan Dep. at 100.

[49]  Hogan Dep. at 102.

In a September 28, 2007, letter to Long (the "Gessner letter"[50]), Joseph Gessner (Taggart's successor at Colonial) stated that: (a) of the 146 presales, "the Borrower has closed 106 units," "40 or so . . . have fallen out," and Cape Haze was not expected to have more than one or two more closings.[51] Gessner also informed Long that, notwithstanding the "three methods"[52] for determining the release price in Section 2.7 of the Loan, at some point Colonial decided to use only the second method.[53] That is, Colonial "determined that it would always just require 100% of the net sales proceeds as the release price."[54] Gessner attempted to justify the decision on the grounds that (i) in retrospect, a release price calculated as one hundred percent of the net sales proceeds appeared to be "almost always" greater than "the 90% of gross sales price calculation" and (ii) "the formula that was tied to 125% of the average loan amount was not adequately defined to provide for a clear calculation."[55]

Gessner further stated that, at some point, Colonial "made a decision to provide partial releases on a number of units (approximately half) even though the net proceeds to be applied to the A&D Loan (Tranche 1) did not meet the minimum required curtailment of $74,060/unit as required in the Loan Agreement."[56] Gessner explained that, because the prices realized from the sale of

---

[50] Long Dep. at 170 & Ex. 17 (Dkt. 92-18); Dkt. 37-13.

[51] Gessner letter at 2.

[52] Gessner letter at 2.

[53] Gessner letter at 2.

[54] Gessner letter at 2; *see also* Taggart Dep. Ex. 8 (Dkt. 93-9).

[55] Gessner letter at 2.

[56] Gessner letter at 2-3.

smaller, cheaper units "could not make such a disproportionate contribution to the reduction of the A&D [Tranche 1] Loan as the larger, higher price point units," Colonial determined that,

> so long as the accumulated *average* release price applied to the A&D [Tranche 1] Loan exceeded the minimum threshold, [Colonial] would release some units at below the average and make up the difference on the higher end units. To date, 106 units have been released against the A&D Loan [Tranche 1] for a total paydown of $8,378,027, or an average of $79,038.[57]

In a September 27, 2008, email to Michelle Fuller (and others),[58] Gessner stated his understanding that, with respect to the two most recent closings, "the title company went ahead and closed on these units without a separate estoppel letter from the Bank on each unit and instead relied on their previous blanket authorization from Joe Taggart."[59] Gessner also noted, with respect to one of the most recent closings, that

> the release price being applied to the A&D Loan . . . does not meet the minimum requirement of $74,060/unit. However, after these two closings, the A&D loan will have been paid down by $8,378,027 on the 106 units closed to date, or an average of $79,038/unit, which does exceed the aggregate amount to have been obtained through 106 closings.[60]

Additionally, Taggart admitted that: (a) Colonial released mortgage liens upon sales that failed to meet the minimum release price required by the Loan Agreement;[61] (b) in response to a series of email requests from Zobida Halpin (who worked in Colonial's construction loan administration group), Taggart requested and obtained approval (or himself approved) waivers of

---

[57] Gessner letter at 3.

[58] Taggart Dep. Ex. 21 (Dkt. 93-22); Dkt. 37-14.

[59] Dkt. 93-22.

[60] Dkt. 93-22.

[61] *See* Taggart Dep. at 54-55, 74, 151-52.

the minimum release price;[62] and (c) in response to a June 11, 2007, request from Halpin that Taggart obtain approval from Colonial's senior lender for terms (apparently, a lower release price) for the units "going forward . . . since we are not accepting what is in the loan agreement," Taggart explained that "[t]hey are giving some discounts to buyers to salvage closings. It's this or no closing at all. Given the market, taking a $2,000 reduction is a smart business decision,"[63] and Taggart "likely" obtained the requested approval.[64] Hogan confirmed that Colonial accepted less than "the release price of $74,060" on "numerous" units without consulting PNC.[65]

Without describing the reduction, Defendant admits that Colonial agreed to accept a lower release price on some units without obtaining PNC's written consent.[66] Defendant also admits[67] that Colonial accepted release prices as described on a September 27, 2007, Cape Haze Lot History Report,[68] which appears to show that Colonial accepted release prices less than $74,060 on more than fifty units.

To his September 28, 2007, letter to Long, Gessner apparently attached a spreadsheet (not in the record) containing an "updated project budget for the vertical [Tranche 2] loan."[69] Gessner

---

[62] *See* Taggart Dep. at 26-27, 77-81, 155, 157-60, and Ex. 9 (Dkt. 93-10), 27 (Dkt. 93-28), 28 (Dkt. 93-29) & 29 (Dkt. 93-20).

[63] Taggart Dep. at 156 & Ex. 27 (Dkt. 93-28).

[64] Taggart Dep. at 156.

[65] Hogan Dep. at 71-72; *see also* Hogan Dep. Ex. 4 (Dkt. 91-5) ("Mercantile/PNC was not consulted prior to making significant decisions about the loan including . . . acceptance of lower release prices than the minimum required by the Loan.").

[66] *See* Dkt. 39-2 (No. 4); Dkt. 39-2 (No. 13).

[67] Dkt. 39-2 (No. 16).

[68] Dkt. 37-8.

[69] Gessner letter at 1.

noted that "the total project budget has increased by approximately $5MM since the budget included in the original Loan Agreement,"[70] and Gessner stated that Colonial had not yet been able to find internal documentation regarding "at what point the project budget was increased and what level of contribution was required from the Borrower."[71]   However, Gessner reported the borrower's report

> that the cost overruns were identified early in the project and that, in lieu of increasing the loan amount, the Bank required the Borrower to contribute their 20% equity to the additional costs while the Bank permitted the remaining 80% of the funds to be drawn down from the $2.5MM Reserve Account . . . . The Reserve Account has been drawn down to a current balance of $376M.  The Borrower reports that this understanding was never codified in an amendment to the Loan Agreement.[72]

Gessner also calculated the current loan-to-vale ratio (based on the current outstanding Loan balance of $23,417,687 [$5,308,678 for Tranche 1 and $18,109,000 for Tranche 2], the value of the remaining 56 completed units [$19,282,666] and the value of the remaining 10 "building pads" on which no units had been built [$4,530,000]) as 98.3% [73]

To a September 27, 2008, email to John Kravec (representing the borrower[74]), Gessner apparently attached a spreadsheet (not in the record) comparing budget information provided by the borrower with "the original approved budget . . . per the Loan Agreement."[75]  Gessner stated that the

---

[70]  Gessner letter at 1.

[71]  Gessner letter at 1; *cf.* Loan Agreement 5.1(b).

[72]  Gessner letter at 1-2.

[73]  Gessner letter at 1.

[74]  *See* Taggart Dep. at 73-74.

[75]  Taggart Dep. Ex. 21 (Dkt. 93-23); Dkt. 37-14.

spreadsheet shows that "the total budget increased from $69MM to $74.7MM although it does not appear that the Loan Agreement was ever modified to reflect the revised budget."[76]

Long states that he first learned of Colonial's acceptance of lower release prices, funding of cost overruns, and release of the construction reserve in a September, 2007, conversation with Taggart.[77] As Taggart recalled the conversation, Long expressed surprise but also approved of Colonial's handling of these matters.[78]

PNC contends that the undisputed facts establish that Colonial breached the Participation Agreement by modifying the terms of the Loan Agreement, without PNC's written consent: (1) by releasing condominium units from the mortgage lien based on release prices below the minimum required by the Loan Agreement; (2) by funding construction of more than 92 units at one time; (3) by using the Reserve Account to pay interest and to fund budget overruns (thereby increasing the amount of the Loan); and (4) by permitting Cape Haze to continue construction of the project without additional capital at a time when the loan-to-value ratio ("LTV") of the project was 98% and the Loan Agreement required the project to maintain a 75% LTV. Additionally, PNC argues that Colonial violated the Participation Agreement by downgrading its credit rating on the Cape Haze project without notifying PNC in writing.

### *Standard*

Summary judgment is proper if, following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any

---

[76] Dkt. 93-23.

[77] Long Dep. at 156-158.

[78] Taggart Dep. at 152-54.

material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. Plaintiff's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Id.*

## *Discussion*

Under Florida law,[79] Plaintiff must prove the following elements on its breach of contract claim: (1) a valid contract, (2) a material breach, and (3) damages. *Merin Hunter Codman, Inc. v. Wackenhut Corrs. Corp.*, 941 So. 2d 396, 398 (Fla. 4th DCA 2006). "In addition, in order to maintain an action for breach of contract, a claimant must also prove performance of its obligations under the contract or a legal excuse for its nonperformance." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. 2d DCA 2006).

Florida contract law allows recovery of "those damages either arising naturally from the breach or contemplated by the parties at the time of the contract." *Pinnacle Port Cmty. Ass'n v. Orenstein*, 952 F.2d 375, 379 (11th Cir. 1992) (citing *T.D.S., Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1532 n.11 (11th Cir. 1985)). "Damages are recoverable so long as the actual consequence of breach of contract could have been reasonably expected to flow from the breach." *T.D.S., Inc.*, 760 F.2d at 1532 n.11 (citing *Natural Kitchen, Inc. v. American Transworld Corp.*, 449 So. 2d 855, 860 (Fla. 2d DCA 1984)). "Under contract law, an injured party may look to the legal system to place it in the position it would have been in had the bargain been performed as agreed to; in other words, to achieve its expectation interest." *Air Caledonie Int'l v. AAR Parts Trading, Inc.*, 315 F. Supp. 2d 1319, 1337 (S.D. Fla. 2004) (citing *MCA Television Ltd. v. Pub. Interest Corp.*, 171 F.3d 1265, 1271 (11th Cir. 1999)).

---

[79] *See* Participation Agreement § 19(f) ("This Agreement shall be construed, interpreted, and enforced in accordance with the laws of Florida as are in effect from time to time."); Loan Agreement § 8.10 ("This Agreement shall be governed by and construed in accordance with the laws of the State of Florida."). Defendant does not dispute that Florida law applies.

The parties do not dispute the validity of the Participation Agreement[80] or the Loan Agreement. As will be discussed, the undisputed facts establish that Colonial breached certain material provisions of the Participation Agreement. Plaintiff's proof of damages flowing from any particular breach is not, however, adequate for summary judgment purposes. Moreover, certain affirmative defenses are premised on disputed issues of material fact, including but not limited to consent and waiver. Summary judgment will accordingly be denied.[81]

### 1. The Tranche 1 Release Price

PNC argues that Colonial breached the Participation Agreement by waiving the release price required by the Loan Agreement without PNC's prior written consent. Section 2.7 defines the release price for each condominium unit as the greater of: (i) 90% of the gross list price of the unit, (ii) 100% of the net proceeds from the sale of the unit, or (iii) "one hundred twenty-five percent (125%) of the amount of the Loan funds used for the construction of the Unit . . . ."[82]

Section 2.7 further provides that, upon receipt of any release price, Colonial shall apply the payment to the outstanding balances of Tranche 1 and Tranche 2 as follows:

> (i) one hundred percent (100%) of the Tranche 2 amount allocated to the construction of the applicable Unit plus Twelve Thousand Eight Hundred Twenty-One Dollars ($12,821.00) per Unit shall be applied to the principal balance of Tranche 2, and (ii) the balance of the Release Price shall be applied to the principal balance of Tranche 1, but in no event less than Seventy-Four Thousand Sixty Dollars per Unit ($74,060.00).[83]

---

[80] *See* Pretrial Statement § 9(21).

[81] At trial, the parties should tailor their presentation of evidence accordingly.

[82] Loan Agreement § 2.7.

[83] Loan Agreement § 2.7.

Although the chief purpose of this provision is evidently to determine the allocation of the release price between Tranche 1 and Tranche 2, the provision unequivocally requires that the amount of the release price allocated to Tranche 1 be at least $74,060.00 for each unit. Additionally, Plaintiff presents evidence that Taggart,[84] Gessner,[85] and Hogan[86] understood the provision in this way,[87] as well as evidence[88] that this understanding accorded with Colonial's common practice.[89] Defendant presents no extrinsic evidence to the contrary. Thus, even if the provision is ambiguous, undisputed record evidence demonstrates that the parties intended Section 2.7 to require that the Tranche 1 release amount be at least $74,060.00 for each unit.[90] Additionally, PNC presents undisputed evidence that Colonial accepted a release price lower than $74,060.00 on some units without

---

[84] *See* Taggart Dep. at 54-55, 151-52.

[85] *See* Gessner letter at 2-3.

[86] *See* Hogan Dep. at 71-72; Hogan Dep. Ex. 4 (Dkt. 91-5).

[87] *See Rafael J. Roca, P.A. v. Lytal & Reiter, Clark, Roca, Fountain & Williams*, 856 So. 2d 1, 5 (Fla. 4th DCA 2003) ("Where an agreement is ambiguous, the meaning of the agreement may be ascertained by looking to the interpretation that the parties have given the agreement and the parties' conduct throughout their course of dealings."); *Brown v. Fin. Serv. Corp., Int'l*, 489 F.2d 144, 151 (5th Cir. 1974) ("[C]ourts may look to subsequent action of the parties to determine the interpretation that they themselves placed on the contractual language.") (citing *LaLow v. Codomo*, 101 So. 2d 390 (Fla. 1958)). The Eleventh Circuit has adopted as binding precedent all decisions the former Fifth Circuit made prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

[88] *See* Taggart Dep. at 28.

[89] *See Arriaga v. Florida Pacific Farms, L.L.C.*, 305 F.3d 1228, 1247 (11th Cir. 2002) (noting that "'custom and usage' may be considered in construing ambiguous terms" of a contract) (citing *Farr v. Poe & Brown, Inc.*, 756 So. 2d 151, 152-53 (Fla. 4th DCA 2000)).

[90] "It is well settled that the actual language used in the contract is the best evidence of the intent of the parties and, thus, the plain meaning of that language controls." *Rose v. M/V "GULF STREAM FALCON"*, 186 F.3d 1345, 1350 (11th Cir. 1999) (citing *Green v. Life & Health of America*, 704 So. 2d 1386, 1391 (Fla. 1998)). Absent an ambiguity, the intent of the parties should be ascertained from the words in the contract. *Emerald Pointe Prop. Owners' Ass'n, Inc. v. Commercial Constr. Indus., Inc.*, 978 So. 2d 873, 877 (Fla. 4th DCA 2008). However, if contractual language is ambiguous, extrinsic evidence may be considered to ascertain the intent of the parties. *Emerald Pointe Prop. Owners' Ass'n.*, 978 So. 2d at 877. A latent ambiguity exists "'where a contract fails to specify the rights or duties of the parties in certain situations and extrinsic evidence is necessary for interpretation or a choice between possible meanings.'" *Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1310 (11th Cir. 1998) (quoting *Crown Mgmt. Corp. v. Goodman*, 452 So.2d 49, 52 (Fla. 2d DCA 1984)).

obtaining PNC's written consent.[91] This provision is a material provision of the Loan Agreement, and by reference the Participation Agreement.

With respect to damages, PNC submits the January 21, 2009, report of Gleason & Associates, P.C. (the Gleason Report"[92]) purports to demonstrate PNC's damages from Colonial's acceptance of Tranche 1 release prices less than $74,060.00. Based on the Cape Haze Lot History Report, the Gleason Report combines the individual shortfalls (the difference between the $74,060.00 required to be allocated to Tranche 1 and the amount actually allocated to Tranche 1 for each unit) and concludes that (a) the outstanding Loan balance would have been further reduced by the resulting sum of $1,669,343.00, "if the minimum release prices were received on all units"[93] and (b) based on PNC's participation percentage of 42.6345%, "PNC was underpaid by at least $711,716.00 on the Loan through September 25, 2007."[94]

Although plausible, the former conclusion is not sufficiently explained. The Gleason Report fails to explain clearly how Colonial's refusal to release units for sales that failed to meet the Tranche 1 release price would have resulted in the projected reduction in the overall principal Loan balance. *See* 11 James W. Moore, Moore's Federal Practice § 56.14[1][e][I] (3d ed.) ("The expert is required to inform the court of the facts and reasons from which the expert's opinion was derived so that the court can look behind the expert's 'ultimate conclusion . . . and analyze the adequacy of its foundation.'") (quoting *Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chicago*, 877 F.2d 1333,

---

[91] *See* Dkt. 39-2 (Nos. 4, 13, 16); Dkt. 37-8; Taggart Dep. at 78-80, 153.

[92] Dkt. 37-9; *cf*. Dkt. 35-8.

[93] Gleason Report at 6.

[94] Gleason Report at 6.

1339 (7th Cir. 1989)).[95] In short, the undisputed facts do not adequately demonstrate PNC's damages from Colonial's waiver of the minimum Tranche 1 release price. Accordingly, summary judgment is precluded. *See Block v. West Palm Beach*, 112 F.2d 949, 952 (5th Cir. 1940) ("[I]t is elementary that the mere breach of an agreement which causes no loss to plaintiff will not sustain a suit by him for damages . . . .").

## 2. Excess Units Under Construction

PNC argues that Colonial breached the Participation Agreement by permitting Cape Haze to have more units under construction than the maximum allowed by the Loan Agreement, without PNC's written consent. The Loan Agreement provides: "In no event shall Borrower have in excess of ninety-two (92) units under construction at any one time without Lender's prior written consent."[96] PNC presents evidence that Taggart was aware that Cape Haze had 140 units under construction in September, 2006, and 162 units in November, 2006.[97] Taggart also stated that he did not recall asking Long for PNC's consent to waive the limit on units under construction and did not recall ever asking anyone whether Cape Haze could have more than 92 units under construction at one time.[98] Finally, the Gleason Report concludes, based on unspecified "interviews with John Long," that

---

[95] The Gleason report appears to assume that Colonial's refusal would have resulted in Cape Haze's making up the shortfalls on discounted units with an equity contribution by Cape Haze. *See* Gleason Report at 6 ("After PNC learned that Colonial had accepted release prices below the minimum, PNC expressed its view that release price shortfalls should have been made up by equity calls on the Borrower."). However, the Gleason report does not address Cape Haze's ability to fund an equity contribution of $1,669,343 or the likely effect on the project and future Loan repayments.

[96] Loan Agreement § 2.1(b)(iii)(5). In accordance with its plain meaning, Hogan understood the phrase "under construction" to mean "[u]nits on which work is still ongoing . . . That are not completed as yet." Hogan Dep. at 87. Relying on common usage in the industry as well as prior dealings with Colonial, Long stated that the phrase "under construction" in the Participation Agreement means units with "vertical improvements" that are "unsettled," Long Dep. at 205, that is, units as to which "the title hasn't transferred to a third party purchaser," Long Dep. at 206.

[97] *See* Taggart memorandum; *see also* Taggart Dep. at 98-100; Taggart Dep. Ex. 8 (Dkt. 93-9).

[98] Taggart Dep. at 100.

"PNC was unaware that the Borrower had units in excess of the maximum permitted under construction."[99] *See* 11 James W. Moore, Moore's Federal Practice § 56.14[1][e][I] (3d ed. 1997) ("An affidavit that sets forth an expert's opinion must also include the underlying factual basis on which that opinion is based, or it will be deemed inadmissible."); *cf. Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

Notwithstanding, the Loan Agreement does not unqualifiedly prohibit Cape Haze from having more than 92 units under construction at a given time. Rather, the Loan Agreement prohibits Cape Haze from exceeding the limit "without [Colonial's] prior written consent."[100] While this provision of the Loan Agreement is material, the undisputed facts do not demonstrate whether Cape Haze obtained Colonial's written consent with respect to the maximum number of units under construction or whether Colonial's written consent, if provided, would itself have violated the Participation Agreement.

Additionally, the undisputed facts do not establish damages resulting from this alleged breach. The Gleason report asserts that, if Colonial had not permitted Cape Haze to exceed the limit,

> proceeds from the units that did sell could have been used to repay the Loan, rather than fund additional construction cost for the excess units. As a result of Colonial allowing the Borrower to build excess units, PNC's outstanding participation balance is higher than it otherwise would have been.[101]

---

[99] Gleason Report at 7 and n.32.

[100] Loan Agreement § 2.1(b)(iii)(5).

[101] Gleason Report at 7.

20

The Gleason Report defines the unsold excess units ("available and unsold units remaining"[102] or "Spec inventory outstanding"[103]) as the 53 or more units (defined as units under construction in 2006 [162] minus units permitted [92] under the agreement = 70) not under contract as of August 29, 2007.[104]  Using Hogan's statement of the  average construction loan per unit as $323,000,[105] the Gleason report multiplies that amount by the unsold excess units to arrive at an amount ("Total excess construction for Spec Inventory") ($17,119,000) that would have been available to repay the Loan balance and an amount ($7,298,600) that would have been available to repay PNC's share (42.6345%) of the Loan balance.[106]  However, because the Gleason Report's assumptions and methodology are in part unclear and in part unsupported, the report does not support summary judgment on damages.[107]

---

[102]  Gleason Report at 7.

[103]  Gleason Report Ex. B.  *But see* Hanson Dep. at 92 (suggesting that a "spec. house" is one built without a buyer); Change in Risk Grade Memorandum (stating that, of the total units built, 146 were presold and "14 were to be spec.").

[104]  Gleason Report at 7 & Ex. B.

[105]  Hogan Dep. Ex. 4 (Dkt. 91-5).

[106]  Gleason Report Ex. B.

[107] For example, the Gleason Report assumes that only 92 units would have been built absent the breach.  In light of this assumption, the Gleason Report appears to overstate the funds that would have been available if no more units had been built by not subtracting the proceeds from the sale of the approximately 17 excess units that closed or remained under contract (or at least the portion attributable to Tranche 1, the non-revolving portion of the Loan).  More generally, the Gleason Report appears to credit PNC with its share of the proceeds from what it describes as the "Spec. inventory" without assigning PNC any share of the risk that the units would not close.  Further, the Gleason Report appears to assume either that the buyers or the condominium units (or both) were fungible or that, if only 92 units had been built, none would have "fallen out."  More generally, the Gleason Report provides no estimate of what the outstanding loan balance (including the outstanding balance on Tranche 1) would have been had only 92 units been built (particularly in light of the cost overruns identified early in the project).

    Further, in calculating PNC's damages, the Gleason Report appears to disregard the value to PNC (as a participant of the Loan secured by the lien on those assets) of the "excess" unsold units (as well as the remaining building pad sites).  However, PNC's motion otherwise relies on an appraisal that estimates their value at $19,282,666 (for 56 inventory units) and $4,530,000 (for the pad sites), that is, at a value approximately equal to the outstanding loan balance.  Finally, PNC and the Gleason Report assume causation and fail to address evidence (*e.g.*, the testimony of Woodward S. Hanson, Colonial's expert) that, if construed favorably to Colonial, tends to show that a decision to fund more than 92 units may

21

### 3. The Construction Reserve

PNC contends that Colonial breached the Participation Agreement by allowing Cape Haze to use the construction reserve to fund budget overruns and interest payments without PNC's prior written consent. Defendant admits that Colonial allowed Cape Haze to use the Reserve to fund budget overruns and to make interest payments without obtaining PNC's consent.[108] This provision was a material provision of the Loan Agreement and Participation Agreement. However, even if allowing Cape Haze to use the construction reserve for these purposes violated the Participation Agreement, PNC has not established damages flowing from this breach with reasonable certainty.

To calculate PNC's damages, the Gleason Report relies on Gessner's statement that, according to the borrower, Colonial permitted funds to be drawn down from the $2.5 million construction reserve to fund cost overruns.[109] The Gleason report multiplies the $2.5 million construction reserve by PNC's participation share to get PNC's damages ($1,065,863).[110] While acknowledging that the construction reserve may have been used to fund construction of "excess" condominium units, the Gleason Report appears to ignore (a) the effect of the proceeds from the sale of "excess" units on the overall loan balance and (b) the value of the security interest in the remaining "excess" units. Further, the Gleason Report assumes that, absent a breach, the funds would not have been spent to fund cost overruns (a purpose for which they were expressly intended),

---

have been reasonable in the circumstances, which in turn suggests that PNC could not (consistently with its obligation not to unreasonably withhold its consent) or would not have refused its consent if timely requested.

[108] Pretrial Statement § 9(25); *see also* Hogan Dep. Ex. 91-5 ("Mercantile/PNC was not consulted prior to making significant decisions about the loan including . . . release of reserve deposits . . . .").

[109] See Gleason Report at 8 (citing Gessner letter).

[110] See Gleason Report at 9. However, the Gleason Report apparently disregards Gessner's statement that, as of September 28, 2007, the reserve account had a balance of about $376,000. *See* Gessner letter at 2.

*i.e.*, that PNC could and would have withheld its consent to the use of the funds, and fails to estimate or explain the likely effect on the overall loan balance of a refusal to fund the cost overruns. In short, the undisputed facts do not establish damages resulting from the alleged breach.

### 4. Excess Loan-to-Value

PNC argues that Colonial violated the Participation Agreement by advancing funds under the Loan when the loan-to-value ratio ("LTV") of the project was 98% and the Loan Agreement required the project to maintain a 75% LTV. Colonial admits that it advanced funds under the Loan when the LTV was above 75%.[111] While the undisputed facts demonstrate that Colonial did not comply with this limitation, Colonial contends that it reserved the right to do so in the Loan Agreement. Moreover, the undisputed evidence does not establish damages with sufficient certainty. Disputed issues of material fact preclude summary judgment on this claim and defense.

### 5. The Credit Rating Change

Finally, PNC argues that Colonial violated the Participation Agreement by downgrading its credit rating on the Cape Haze project without promptly notifying PNC in writing. PNC's argument relies on the August 13, 2007, Change in Risk Grade Memorandum (recording the change in the Loan's credit rating from six to seven); on the unauthenticated "Loan Approval Report/Request" indicating that in April or May, 2005, Colonial assigned a grade of three to an "A&D loan" that ultimately became Tranche 1;[112] and, apparently, on Long's testimony that Hogan refused to disclose Colonial's internal credit rating on the Loan in December, 2007.[113] However, assuming the change

---

[111] *See* Dkt. 39-2 (No. 11); Pretrial Statement § 9(26); *cf.* Hogan Dep. Ex. 4 (Dkt. 91-5) ("Mercantile/PNC was not consulted prior to making significant decisions about the loan including funding of cost overruns . . . .").

[112] Dkt. 37-16.

[113] Dkt. 37 at 19 (citing Long Dep. at 144-45).

in the internal credit score assigned to the Loan constituted a "material[] downgrade[] [of Colonial's] relationship with [the] Borrower,"[114] PNC presents no evidence that Colonial's failure to promptly provide written notice of the downgrade damaged PNC.

*Conclusion*

For the foregoing reasons, and because Plaintiff fails to address Defendant's affirmative defenses, which include consent/waiver and failure to mitigate,[115] Plaintiff is not entitled to summary judgment as to liability on Count One of the Complaint.[116] The Court concludes that an order pursuant to Rule 56(d)(1) specifying facts not genuinely at issue is not practicable and would not materially expedite the presentation of the evidence or progress of this case.

Accordingly, it is **ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Dkt. 37) is **DENIED**.

**DONE AND ORDERED** this 6th day of November, 2009.


/s/James D. Whittemore
**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record

---

[114] Participation Agreement § 7.

[115] *See* Dkt. 33 at 5-6.

[116] *See Stillman v. Travelers Ins. Co.*, 88 F.3d 911, 913-14 (11th Cir. 1996); *United States v. Ownbey Enters., Inc.*, 789 F. Supp. 1145, 1151-52 (N.D. Ga. 1992) ("[T]he burden is on Plaintiff, as the moving party, to show the absence of evidence which supports an essential element as to each of Defendant's affirmative defenses, before Defendant even has to come forward with evidence establishing that a material question of fact exists as to those defenses.") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1985)). *But see Harper v. Delaware Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1090-91 (D. Del. 1990).