PNC BANK,
NATIONAL ASSOCIATION,

     **Plaintiff,**

v.                          Case No.:  8:08-cv-610-T-27TGW

BRANCH BANKING
AND TRUST COMPANY,

     **Defendant.**

_____/

## ORDER

This cause was tried before the Court. Upon the evidence presented, including the parties' designated transcripts of depositions, and the final summations of the parties, the Court finds and concludes:

This lawsuit involves a dispute between Plaintiff PNC Bank, National Association ("PNC"), the successor in interest of Mercantile Mortgage Corporation ("Mercantile"),[1] and Defendant Branch Banking and Trust Company ("BB&T"), the successor in interest of Colonial Bank, N.A. ("Colonial"). In November, 2005, Colonial and Mercantile entered into a Participation Agreement with respect to a construction loan that Colonial made to The Hammocks Cape Haze, LLC ("Cape Haze"), which was to be used to finance the development and construction of 234 condominium units known as the Cape Haze project. Pursuant to the Participation Agreement, Mercantile

_____

[1] PNC and Mercantile are referred to in this order interchangeably.

1

purchased a 42.6345% interest in the loan and security. Joseph E. Taggart, Vice President of Colonial, originated the loan and executed the Loan Agreement on behalf of Colonial. The loan's maturity date was September 20, 2007.[2] The Participation Agreement was executed on behalf of Mercantile by John D. Long, Senior Vice President, and by Taggart on behalf of Colonial. Cape Haze eventually defaulted on the Loan.

The Amended and Restated Loan Agreement provided for a maximum loan amount of $34,864,174. A portion of the loan ("Tranche 1) was a non-revolving line of credit for $13,864,174.00. Tranche 1 was to be used for the acquisition of land, construction and installation of infrastructure, and construction of common amenities.[3] A second portion of the loan ("Tranche 2") was a revolving line of credit for $21,000,000.00, to be used for the construction of the condominium units, or "vertical improvements."[4]

**Relevant contractual provisions**

Pursuant to the Participation Agreement, Colonial agreed to be responsible for collection, management, enforcement and administration of the loan, including the collection of principal payments and remitting to Mercantile its share of the principal, interest, and fees. The parties agreed on limitations on Colonial's liability. Section 9 of the Participation Agreement, entitled "Management and Duty of Care," provides:

> Lender [Colonial] shall not be liable under this Agreement to Participant [Mercantile] for any action taken or omitted or for any error in judgment, except for Lender's material breach of this Agreement or its own gross negligence, bad faith or willful misconduct. Participant acknowledges that Lender's obligations with respect to the

---

[2] *See* Loan Agreement § 1.1(v) (J2-3).

[3] *See* Loan Agreement §§ 1.1(jj), 2.1(a) (J2-5, 6).

[4] *See* Loan Agreement §§ 1.1(ll), 2.1(b) (J2-5, 6).

Loan shall be no greater than the customary practices presently employed by Lender in administering and servicing other loans covering commercial properties. Lender shall, subject to the provisions of this Agreement, retain all rights with respect to enforcement, collection, [and] administration of the Loan and the Loan Documents.[5]

Section 16 of the Participation Agreement, entitled "Express Restrictions," provides that Colonial may not, without Mercantile's prior written consent (not to be unreasonably withheld):

> a.    In any material respect, make or consent to any release, settlement, compromise, indulgence, substitution, renewal, extension, modification or other alteration in any of the material obligations, covenants or agreements of the Borrower, Guarantor or any other person under any of the Loan Documents . . . or

> g.    Release any security for the Loan other than releases made in connection with the sale of units to third party purchasers, or substitute or exchange any such security with security not of approximately equal value.[6]

The Participation Agreement further provides: "[I]n the event Lender [Colonial] decides to terminate its credit relationship with a Borrower, or materially downgrades its relationship with a Borrower, Lender [Colonial] promptly will provide written notice of such determination to Participant."[7]

Section 2.1(a)(ii) of the Loan Agreement, regarding Tranche 1 funding, provides:

> The principal amount disbursed under Tranche 1 shall not exceed the lesser of (A) seventy-five percent (75%) of the appraised value of the Property, as improved with the Tranche 1 Improvements, as determined by Lender in its sole discretion, or (B) ninety percent (90%) of the costs of acquisition of the Property and completion of the Tranche 1 Improvements, as determined by Lender in its sole discretion.[8]

Section 2.1(b)(iii) of the Loan Agreement, regarding Tranche 2 funding, provides, in relevant

---

[5] Participation Agreement § 9(J4-5-6).

[6] Participation Agreement § 16 (J4-7-8).

[7] Participation Agreement § 7 (J4-4); *cf.* Participation Agreement § 18 (J4-8).

[8] Loan Agreement § 2.1(a)(ii) (J2-6).

part:

>The total funds advanced under Tranche 2 with respect to any building shall not exceed the lesser of:
>
>(A)     Eighty percent (80%) of the budgeted costs for vertical construction of the applicable building (excluding $12,821.00 per Unit in brokerage commissions and marketing fees paid up front at Closing), as reflected on the Budget;
>
>(B)     Seventy-five percent (75%) of the value of the applicable building as determined pursuant to an updated Lender-approved MAI appraisal (less the $59,249.00 per Unit allocated to Tranche 1, and also less the $12,821.00 per Unit brokerage fee); or . . . [9]

The Loan Agreement further provides: "In no event shall Borrower have in excess of ninety-two (92) Units under construction at any one time without Lender's prior written consent."[10]

Section 2.7 of the Loan Agreement requires Colonial to release from the mortgage lien any condominium unit sold pursuant to a qualified sales contract, but imposes a minimum release price per unit:

>provided, however, that . . . Borrower shall pay to Lender, as part of the sale of any such Unit, a release price (the "**Release Price**") equal to the greater of (i) ninety percent (90%) of the gross list price of the applicable Unit, or (ii) one hundred percent (100%) of the Net Proceeds . . . resulting from the sale of the applicable Unit; but in no event less than one hundred twenty-five percent (125%) of the amount of the Loan used for the construction of the Unit (including an appropriate allocation of Loan funds used for land acquisition, infrastructure and common amenities, as determined in Lender's sole, but reasonable discretion).[11]

Section 2.7 further provides:

>Upon receipt of any Release Price, Lender shall apply such payment to the outstanding balances of Tranche 1 and Tranche 2 as follows: (i) one hundred percent (100%) of the Tranche 2 amount allocated to the construction of the applicable Unit

---

[9]  Loan Agreement § 2.1(b)(iii)(4) (J2-7).

[10]  Loan Agreement § 2.1(b)(iii)(5)(J2-8).

[11]  Loan Agreement § 2.7(J2-10).

plus Twelve Thousand Eight Hundred Twenty-One Dollars ($12,821.00) per Unit shall be applied to the principal balance of Tranche 2, and (ii) the balance of the Release Price shall be applied to the principal balance of Tranche 1, but in no event less than Seventy-Four Thousand Sixty Dollars per Unit ($74,060.00).[12]

## The Reserve Agreement

As a condition to the Loan, Cape Haze executed a "Reserve Agreement" that required Cape Haze to establish and maintain, as additional security for the Loan, a construction reserve in the amount of $2.5 million, which could be reduced to $1 million on the repayment of Tranche 1. (J3).

The Reserve Agreement provides that the Reserve "shall be held and disbursed or released by Lender [Colonial] strictly in accordance with the terms of this Agreement,"[13] and that the Reserve is established to provide funds for the following purposes:

(i)     For payment of costs and expenses incurred by Borrower in connection with the performance of the work to the Project to complete or correct the work of unbonded subcontractors (collectively, the "**Additional Construction Work**"); and

(ii)     For payment of increased Construction Costs beyond what is provided for in the Budget ("**Cost Increases**").[14]

## The Complaint

PNC brought this action against BB&T in a three count complaint. PNC raised three distinct claims, breach of contract (Count I), gross negligence, bad faith or willful misconduct (Count II), and breach of trust and fiduciary duty (Count III). (Dkt. 1). At the conclusion of the evidence, Count II was dismissed. (Dkt. 107).

In Count I, PNC claimed that Colonial breached the Participation Agreement by (1) releasing

---

[12]  Loan Agreement § 2.7.(J2-11).

[13]  Reserve Agreement § 3(b) (J3-2).

[14]  Reserve Agreement § 3(b)(i)-(ii) (J3-2).

lots at Cape Haze for less than the minimum price of $ 74,060.00, (2) releasing the $2.5 million reserve for purposes other than what were authorized by the Participation Agreement, (3) allowing for the construction of more than 92 units at a given time, (4) failing to notify Mercantile that Colonial had downgraded the loan, (5) funding construction beyond the construction budget, and (6) allowing the LTV to exceed 75%, all without providing written notice to Mercantile. In Count III, PNC claims that Colonial's actions constituted a breach of its trust and fiduciary duties to Mercantile.

**The Defenses**

Defendant denies that Colonial breached the Participation Agreement or otherwise breached its trust and fiduciary duties to Mercantile. As defenses, Defendant contends that Plaintiff failed to mitigate its damages, consented to Colonial's actions and therefore waived its right to object, Plaintiff breached its implied covenant of good faith, repudiated its duty of performance, and paragraph seven of the Participation Agreement bars Plaintiff's claims. Defendant seeks a set off for "amounts PNC should have paid Colonial under paragraph 13 and 17 of the Agreement . . ." (Dkt. 33, pp. 5-6).

**Liability for Breach**

Under Florida law,[15] Plaintiff must prove the following elements on its breach of contract claim: (1) a valid contract, (2) a material breach, and (3) damages. *Merin Hunter Codman, Inc. v. Wackenhut Corrs. Corp.*, 941 So. 2d 396, 398 (Fla. 4th DCA 2006). As to Count I, PNC has proven

---

[15] *See* Participation Agreement § 19(f) (J4-9) ("This Agreement shall be construed, interpreted, and enforced in accordance with the laws of Florida as are in effect from time to time."); Loan Agreement § 8.10 (J2-34) ("This Agreement shall be governed by and construed in accordance with the laws of the State of Florida."). Defendant does not dispute that Florida law applies.

6

by a preponderance of the evidence that Colonial breached material terms of the Participation Agreement. As a result of Colonial's conduct, Plaintiff suffered damages. Defendant has not proven any of its affirmative defenses.

As to Count III, Plaintiff has not proven that a fiduciary relationship existed between the parties.

## Discussion

The essence of Plaintiff's breach of contract claim is that Colonial, without the consent of Mercantile, altered and modified the terms of the loan through its conduct. Colonial was prohibited from making any "modification or other alteration in any of the material obligations . . . of the Borrower, Guarantor or any other person under any of the Loan Documents." (J4-7, 8). The parties agreed that the Participation Agreement "may not be altered or modified in any manner and none of its provisions may be waived except by agreement in writing executed by each party hereto." (J4-9).

**Release of units for less than minimum Release Price**

When a unit closed, the developer was required to pay the lender not less than 125 % of the amount of the loan used for construction of the unit, including land acquisition, infrastructure and common amenities, "as determined in Lender's sole, but reasonable discretion." (J2-10). From the proceeds of each closing, not less than $74,060.00 per unit was required to be repaid on the Tranche 1 loan. (J2-11). Colonial admitted in its response to Plaintiff's request for admissions that it "agreed to accept a lower 'Release Price,' on some units . . . (J31, No. 4).

The evidence established and Taggart admitted that Colonial accepted units with release prices for the Tranche 1 loan of less than $74,060. (J16-1; J17-1; J20-1). Likewise, James Hogan acknowledged that "numerous" units were released at less than $ 74,060. Moreover, Hogan's

7

testimony confirmed that Colonial could not calculate 125% of the amount loaned on each unit, so it just accepted 100% of the net closing proceeds, believing that this amount would meet the minimum $ 74,060 release price. In his testimony, Hogan confirmed that Mercantile never consented to a release of less than the minimum called for by the loan agreement, or substitution of 100% of net proceeds for 125% of construction costs. Hogan's 2007 interoffice memo acknowledged this as well (J32-1).

The September 25, 2007 "Lot Release History" identified more than 50 units released at less than the minimum $ 74,060 release price. (J30-1, 2, 3). In a September 27, 2007 email, Colonial's Joe Gessner acknowledged that release prices had fallen below the minimum (J26-1, 2). In correspondence the next day to Mercantile, Gessner confirmed that units had been released for less than the minimum $ 74,060. (J27).

Taggart acknowledged in his trial testimony and in his deposition that the minimum release price was to be paid per unit, not an average. (J-64 at p. 55). While acknowledging that the loan agreement required it to collect a minimum of $ 74,060 from each closing to pay toward the Tranche 1 loan, Gessner explained to John Long at Mercantile that it was "decided to provide partial releases on a number of units," even though the releases did not meet the minimum required by the loan agreement (J27-1). Notwithstanding, Gessner explained (and Colonial now argues) that the closings averaged $ 79,038 paid toward the Tranche 1 loan. *Id*. These rationalizations are not persuasive. Nor do they undermine the materiality of the minimum release price per unit.

The loan agreement required a minimum of $ 74,060 from each closing to be paid against the Tranche 1 loan. The $ 74,060 minimum release price per unit was a material component of the loan and Participation Agreement, as this was the amount calculated to retire the Tranche 1 loan.

8

As Taggart explained, minimum release prices are intended to ensure that a sufficient amount of the loan will be paid down from the closing of each unit. Long explained that Mercantile calculated that the sale of 75 units at the minimum release price of $ 74,060 would pay the Tranche I loan in its entirety and that Mercantile never consented, ratified or adopted Colonial's decision to accept less than the $ 74,060 release price.

Long first learned from Taggart that Colonial had released units for less than the $ 74,060 minimum release price in a September 12, 2007 telephone conversation. While Long and Taggart's recollection of how Long responded to Taggart's information conflicts, the Court finds that while Long may have told Taggart he understood the rationale for releasing units at less than the minimum release price, Long did not consent to or ratify the release of units for less than the $ 74,060 minimum release price. In any event, the evidence established that Mercantile never consented to a deviation from the minimum release price in writing, as required by the Participation Agreement.

**Improper funding of loan advances**

The loan amount could not exceed 75% of the value of the development. (J2-6, J2-7). In response to Plaintiff's request for admissions, Colonial admitted that loan funds were advanced "at times in which the outstanding LTV was greater than 75%," and "when the LTV was above 75%."(J31, Nos. 1, 11). In September, 2007, Taggart reported that the LTV on the project was 80.49% (J23-1). On September 27, 2007, Colonial's Joe Gessner confirmed that the LTV, based non a new appraisal, was 98.3%. (J26-1). Gessner also noted in a September 28, 2007 email to the developer that the construction budget had increased by $5.1 million without any modification to the loan agreement. (J26-2). In correspondence to John Long at Mercantile, Gessner confirmed the 98.3% LTV, the $5.1 million budget increase, and that Colonial had permitted 80% of the

developer's cost overruns to be funded from the Reserve Account, although there had not been an amendment to the loan agreement for that funding. (J27-2).

**Exceeded maximum units under construction**

The Loan Agreement provides: "In no event shall Borrower have in excess of ninety-two (92) units under construction at any one time without Lender's prior written consent."[16] (J2-8). The preponderance of the evidence established that Colonial permitted loan advances for the construction of more than 92 units at various times at the Cape Haze project. Taggart's November 20, 2006 Interoffice Memorandum and deposition testimony confirmed that 140 units were under construction as of September 12, 2006 and 162 units were under construction as of November 20, 2006. (J-10-1; J64 at pp. 99-100; 109-110). Hogan confirmed that Mercantile never consented to the funding of more than 92 units at any given time.

This restriction was a material component of the transaction. According to John Long, Mercantile and Colonial agreed to add the 92 unit restriction when they entered into the Participation Agreement and this restriction was not part of the loan before Mercantile became involved. Long explained that the number of pre-sold units did not affect the agreed maximum of 92 units under construction, and Mercantile expected units to close before more were constructed. According to Long, "this governed our exposure" and limited Mercantile's risk if the market declined. Long maintained that Mercantile never consented to having more than 92 units under construction at a time. Further, to the extent Colonial argued that it had the discretion to allow more than 92 units to be under construction, there is no evidence that the borrower sought or obtained Colonial's written

---

[16] Loan Agreement § 2.1(b)(iii)(5) (J2-8). In accordance with its plain meaning, Hogan understood the phrase "under construction" to mean "[u]nits on which work is still ongoing . . . That are not completed as yet." J62 at 87.

consent to construct more than 92 units at a given time, as required.

**Use of Reserve Account and interest reserve**

In a November 7, 2006 email, Taggart approved a request to fund an interest payment from the "escrow account." (J9-1). While Taggart equivocated in his trial testimony as to whether the account he referred to in the email was the Reserve Account set aside to cover unbonded subcontractors, or some other "escrow account," it is inferred from the testimony and evidence that the Reserve Account (J3-2) was indeed used, at least on part, to fund this interest payment on the loan, contrary to the terms of the Reserve Agreement. Prior to trial, Colonial admitted that "it allowed the borrower to use the remaining funds in the Reserve Account to pay interest payments on the account, once contractor costs were paid." (J31, No. 12). This transfer, and any payments of interest drawn from the Reserve Account, violated Section 16(a) of the Participation Agreement. Mercantile never consented to this improper use of the Reserve Account.

Taggart acknowledged his understanding that the loan's interest reserve was not to be used to fund hard costs overruns. Notwithstanding, in a January 2, 2007 email, Taggart approved the use of $278,094 from the "INTEREST/APPLIANC" budget to fund hard costs. (J12-1). This approval likewise violated Section 16(a) of the Participation Agreement. As Long explained, this was a material breach because Mercantile relied on the interest reserve to carry the loan. If the interest reserve was diminished, Long testified that would jeopardize their ability to carry the loan in the future.

The materiality of the restriction on use of the funds in the Reserve Account is self evident. According to John Long, this Reserve Account was established at the closing of the Participation Agreement, and Mercantile never consented to a deviation from the terms of the Reserve Agreement

(J3-1). Colonial admitted that "it did not seek Mercantile/PNC's written consent prior to . . . releasing reserve deposits, and accepting lower release prices. . . " (J31, No. 13).

**Colonial's failure to obtain Mercantile's written consent**

John Long testified that Colonial did not obtain Mercantile's consent to (1) waiving the minimum Release Price, (2) the minimum Tranche 1 loan release price of $ 74,060, (3) funding a construction budget increase by $5.1 million, (4) having more than 92 units under construction at one time, (5) allowing the developer to draw from the Reserve Account for budget increases, or (6) allowing the LTV to exceed 75%. In a 2007 summary memorandum prepared by Colonial's James Hogan, Hogan confirmed that Mercantile was "not consulted prior to making significant decisions about the loan including funding of cost overruns, release of reserve deposits and acceptance of lower release prices than the minimum required by the Loan Agreement." (J32-1; J62 at pp. 72-73; 132).

Colonial's conduct effectively altered or modified material obligations, covenants and agreement of the borrower in the loan agreement. Colonial did not seek and obtain the consent of Mercantile before effecting these alterations and modifications, as required by Paragraph 16 of the Participation Agreement. Further, there was no evidence that Mercantile's consent to these activities was unreasonably withheld. Obtaining Mercantile's written consent for a modification or alteration of a material obligation of the loan was a material requirement of the participation Agreement.

**Failure to notify Mercantile of a material downgrade of the loan**

Hogan prepared an August 13, 2007, "Change in Risk Grade Memorandum," in which the project's risk grade was changed from 6 to 7.(J19-1; J62 at p. 129). This reflected Colonial's decision to downgrade the credit rating of the Cape Haze Loan. Although at trial, Hogan opined that

12

this was not a material downgrade, he acknowledged in his testimony that the loan had been originated at a credit rating of 4 or 5, and that a downgrade from 4/5 to 7 would be material. Furthermore, Hogan, who was Colonial's Senior Credit Officer for Florida at the time, confirmed the credit downgrading in his deposition testimony, and that a change from 4/5 to 6/7 was material to him as a banker and credit officer. (J62 at pp. 98, 100).

The Participation Agreement required Colonial to promptly notify Mercantile in writing of a material downgrade in Colonial's "relationship" with the borrower. (J4-5). It is undisputed that Colonial did not notify Mercantile, in writing or otherwise, of its downgrade of the Cape Haze loan. Considering the nature of the Participation Agreement and that it relates exclusively to the Cape Haze loan, Colonial's failure to notify Mercantile that it had downgraded the Cape Haze loan was a material breach of the Participation Agreement. In this circumstance, a material downgrade of the loan is equivalent to a material downgrade in the relationship between Colonial and the developer.

In sum, as to Count I, Plaintiff has proven, by the preponderance of the evidence, that Colonial breached material terms in the Participation Agreement by modifying or altering the terms of the Loan Agreement without obtaining Mercantile's written consent.

**Mercantile's alleged consent**

Defendant contends, by way of affirmative defense, that Mercantile consented to all actions Colonial took, and therefore waived its right to object, when it agreed to an extension of the loan maturity date. (Dkt. 33, p. 5, Aff. Def. No. 2). In September, 2007, Mercantile approved a 30-day extension of the loan's maturity date, extending the maturity of the two loans until October 29, 2007. (D47-1). Long acknowledged in his testimony that by the time Mercantile agreed to the extension, he was aware that the loan exceeded the 75 % LTV maximum and that the budget had been increased

by approximately $ 5.1 million. He was also aware that Colonial had released units below the minimum release price.

When Mercantile agreed to the loan extension, it was aware that Colonial had not complied with its obligations under the Participation Agreement and had not held the developer to the terms of the loan agreement. Gessner's September 28, 2007 letter to Long addressed several of the issues, including that Colonial had allowed units to close below the minimum release price, had required just 100% of the net sales proceeds as the release price, and that Colonial had accepted less than the minimum $ 74,060 Tranche 1 proceeds "on a number of units (approximately half) . . ." (J27-2). Notwithstanding, it is apparent that Mercantile never consented to any of the transgressions by Colonial and therefore did not waive its right to object. Indeed, during an October 31, 2007 meeting at Colonial's headquarters in Montgomery, Long raised "serious problems" with how the loan had been handled.

Moreover, on December 7, 2007, Long wrote a blistering letter to Hogan, accusing Colonial of willful mismanagement and putting Colonial on notice that Mercantile considered Colonial to be in default of the Participation Agreement and demanding that Colonial repurchase mercantile's interest. (Plaintiff's Exh. # 20 to Long depo.).

By agreeing to the short extension, Mercantile, like Colonial, was merely accommodating the borrower who was facing a declining market. Extending the loan maturity date did not constitute Mercantile's consent to Colonial's conduct. To the contrary, Long's December, 2007 correspondence and the nature of the meeting at Colonial's headquarters underscores Mercantile's continuing objections to Colonial's actions and its position that Colonial had thereby breached its duties under the Participation Agreement. Mercantile did not, by agreeing to a loan extension,

14

consent to Colonial's actions. Nor has PNC failed to mitigate its damages. It was under no obligation to agree to another extension.

Paragraph 7 of the Participation Agreement does not constitute a defense to Plaintiff's claim in Count I that Colonial essentially altered and modified the loan agreement and failed to obtain PNC's consent in writing to the alterations and modifications. Paragraph 7 ("No Warranties") relates to the decision of Mercantile to enter into the Participation Agreement, not Colonial's obligations arising therefrom. Finally, Defendant has not established by a preponderance of the evidence that it is entitled to a set off for "amounts PNC should have paid Colonial under paragraph 13 and 17 of the Agreement . . ." (Dkt. 33, pp. 5-6).

**Breach of trust and fiduciary duties**

As to Count III, Plaintiff's theory of breach of trust and fiduciary duty is premised on Colonial's release of $2,500,000 of collateral security (Dkt. 1, ¶ 29). To the extent Plaintiff incorporated paragraphs 1 through 27 of the complaint, Plaintiff also relies on the conduct discussed above to show that Colonial breached its fiduciary duties to PNC. Defendant denies that a trust relationship existed (Dkt.110. p. 9). The parties have not briefed whether the relationship between Colonial and PNC created fiduciary duties.[17]

Whether fiduciary duties arise from a loan participation agreement is generally controlled by the language of the agreement. *First Citizens Fed. Sav. and Loan Ass'n v. Worthen Bank and Trust Co., N.A.*, 919 F.2d 510, 513 (9th Cir. 1990). Absent language " expressly and unequivocally" creating a fiduciary relationship in a loan participation agreement, no fiduciary relationship exists between the participants. *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,*

---

[17] Plaintiff's summary judgment motion was directed only to Count I (Dkt. 37).

57 F.3d 146, 158 (2d Cir. 1995). Said another way, fiduciary relationships are not inherent in the relationship between co-participants in loan participation agreements, and should not be inferred in the context of loan participation agreements between sophisticated lending institutions, absent unequivocal contractual language establishing a fiduciary relationship.

> Banks and savings institutions engaged in commercial transactions normally deal with one another at arm's length and not as fiduciaries. *See Aaron Ferer & Sons v. Chase Manhattan Bank*, 731 F.2d 112, 122 (2d Cir. 1984). This rule holds true for institutions engaged in loan participation agreements. (citations omitted).

*First Citizens Fed. Sav. and Loan Ass'n v. Worthen Bank and Trust Co., N.A.,* 919 F.2d at 514.

The parties agreed that Colonial was deemed a "trustee of Mercantile's share in any such payments," referring only to any payments of interest, principal and all sums due under the loan agreement (J4-6). Plaintiffs point to no other language in the Participation Agreement unequivocally establishing a fiduciary relationship. To the contrary, the Participation Agreement expressly disclaims a partnership and expressly places limits on Colonial's alleged fiduciary duties to Mercantile, thereby negating the existence of a fiduciary relationship. *See Koken v. First Hawaiian Bank,* 230 F.3d 1367 (9th Cir. 2000).

Section 9 of the Participation Agreement provides that Colonial would not be liable under to Mercantile "for any action taken or omitted or for any error in judgment, except for [Colonial's] material breach of this Agreement or its own gross negligence, bad faith or willful misconduct," and that Colonial's "obligations . . . shall be no greater than the customary practices presently employed by [Colonial] in administering and servicing other loans covering commercial properties." (J4-5-6). This standard of care is lower than what is ordinarily imposed on fiduciaries. *See Leonard v. Dorsey & Whitney LLP,* 553 F.3d 609, 627 (8th Cir. 2009). Accordingly, the Court finds that the

Participation Agreement did not create a fiduciary relationship between the parties, and judgment in favor of Defendant on Count III is granted.

### *Damages*

Florida law allows recovery of "those damages either arising naturally from the breach or contemplated by the parties at the time of the contract." *Pinnacle Port Cmty. Ass'n v. Orenstein*, 952 F.2d 375, 379 (11th Cir. 1992) (citing *T.D.S., Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1532 n.11 (11th Cir. 1985)). "[D]amages are recoverable so long as the actual consequence of breach of contract could have been reasonably expected to flow from the breach." *T.D.S., Inc.*, 760 F.2d at 1532 n.11 (citing *Natural Kitchen, Inc. v. American Transworld Corp.*, 449 So. 2d 855, 860 (Fla. 2d DCA 1984)). "Under contract law, an injured party may look to the legal system to place it in the position it would have been in had the bargain been performed as agreed to; in other words, to achieve its expectation interest." *Air Caledonia Int'l v. AAR Parts Trading, Inc.*, 315 F. Supp. 2d 1319, 1337 (S.D. Fla. 2004) (citing *MCA Television Ltd. v. Pub. Interest Corp.*, 171 F.3d 1265, 1271 (11th Cir. 1999)).

Colonial's actions enabled the borrower to over extend itself at a time when the market was beginning to slow, thereby increasing the likelihood of a default by the borrower. That the parties did not anticipate the market change is irrelevant. To borrow from Plaintiff's summation, Colonial's unilateral actions increased Mercantile's risk in ways that had expressly been protected against in the Participation Agreement. Mercantile has accordingly been damaged by Colonial's actions.

Several distinct facts, unrelated to market considerations, contribute to a reasonably certain calculation of PNC's damages. First, Colonial allowed the borrower to exceed the budget

by $ 5,115,986, of which the borrower funded 20%. This effectively increased PNC's participation in the loan beyond what it contemplated. PNC was accordingly damaged when the loan went into default, commensurate with its 42.6345% participation.

Second, if, as required by the loan agreement, Colonial had required 125% of the amount of the loan to be paid from each closing, and a minimum of $ 70,060 had been applied to the Tranche 1 loan as required, the Tranche 1 loan would have been paid off. The developer projected that the A/D loan (Tranche 1) would be "paid off at 96 units." (J11-2).

At least 104 units closed as of September 25, 2007, but the Tranche 1 loan has not been satisfied. Ivan Hofmann determined that 52 units were released by Colonial below the minimum release price of $ 74,060.(J33-7). As a result, a repayment shortfall on the Tranche 1 loan totaled at least $ 1,669,343. PNC's share of this shortfall, and resulting loss, is **$ 711,716.** (J33-7, 12, 15).

Third, Colonial allowed the borrower to draw on the Reserve Account for purposes other than what was permitted by the loan agreement, specifically interest payments. While use of the reserve account funds did not increase the principal loan amount, those funds were not available to apply to the outstanding loan amount when the loan went into default.

Fourth, by failing to limit the construction of units to 92, Colonial effectively funded more units than the loan agreement allowed at a given time, thereby increasing Mercantile's risk beyond what was contemplated in the Participation Agreement. As explained by Hofmann, Colonial was aware that in 2006, between 140 and 162 units were under construction at different times. The borrower was allowed to draw down on the loan and the Reserve Account to fund construction costs for the excess units. As a result, Mercantile was exposed to a greater risk than

18

what was contemplated in the Participation Agreement. (J33-8). Mercantile was damages as a result. As of November, 2006, 162 units were under construction, 70 more than permitted by the loan agreement. Of those, 17 sold. This resulted in damages of **$ 7,298,600** to Mercantile, in proportion to its share of the $ 17,119,000 in funded construction costs for the 53 unsold units. (J33-16).[18]

Notwithstanding the Court's concerns expressed in the order denying summary judgment, after considering the testimony of Hoffmann and his damages analysis, the Court finds that his expert opinions and analysis are reasonable and based on facts established by the evidence (with one exception), and therefore acceptable, notwithstanding that by necessity, he made certain assumptions.

In his report, Hofmann acknowledged the likelihood that "[c]ertain cost overruns" funded from the $ 2.5 million reserve account may have been used to construct units in excess of the 92 unit maximum and that more information was needed to "avoid duplication of damages." (J33-13, n. 68). In his testimony, Hofmann testified that a "couple of hundred thousand" of the $ 2.5 million reserve was used to pay interest but that the "vast majority" was used to pay cost overruns. Through no fault of the witness, this testimony does not allow for a calculation of damages to the requisite degree of certainty, without risk that damages are duplicated.

**Set off and credits for value of collateral**

Finally, to the extent Plaintiff urges that PNC suffered no damages, or has not proven

---

[18] Defendant's contention that PNC's damages calculation is flawed because PNC failed to prove how much of the remaining units were funded by the developer is rejected. Damages have been calculated based on Colonial's own estimate of the average construction cost per unit of $323,000, a figure which necessarily accounts for any funding by the developer. (J32-1).

damages because there are completed, unsold units having an appraised value in excess of $344,000 per unit, Defendant's arguments relate to set off or credits to which it may be entitled in the future, rather than to whether Defendant suffers judgment. The collateral pledged on the Cape Haze loan is subject to foreclosure, according to the parties. It is apparent, as Defendant points out in its final summation, that there are completed, unsold units having a market value in excess of the average cost of construction. Further, as Defendant points out, there is some residual value to the pad sites. Colonial controls this collateral.

A foreclosure sale of the collateral securing the loan may conceivably result in surplus proceeds, or, in the event the property is purchased by the foreclosing lender, the recovery of collateral with an unknown market value. In any of these events, Colonial may be entitled to a set off against the judgment. As PNC acknowledges, "PNC can never be paid more than the amount it involuntarily lent, plus interest." (Dkt. 111, p. 2). Accordingly, the Court reserves jurisdiction to consider set offs and credits against the judgment on proper application and proof.

Plaintiff is awarded damages under Count I of its complaint in the principal sum of **$ 8,010,316.00**, together with prejudgment interest of **$ 1,736,614.08** (which includes $173,830.27 for 72 days in 2007 at the statutory rate of 11% annually [.0003014 daily]; $881,134.76 for 2008 at the the statutory rate of 11%; $640,825.28 for 2009 at the statutory rate of 8%; and $40,823.77 for 31 days in 2010 at the statutory rate of 6% annually [.0001644 daily]) from the date of the Borrower's default,[19] plus postjudgment interest at the rate prescribed by 28 U.S.C. § 1961.[20] The

---

[19] Damages can become fixed on different dates for purposes of an award of prejudgment interest. *Capitol Envtl. Servs., Inc. v. Earth Tech., Inc.,* No. 1D08-3016, 2009 WL 4110848, *3 (Fla. 1st DCA Nov. 30, 2009). Notwithstanding, Plaintiff seeks prejudgment interest since the date of the borrower's default (Dkt. 111, p. 4), October 20, 2007. Although permitting a simplified prejudgment interest calculation, Plaintiff's proposed date of loss does not result in a windfall for Plaintiff. *Compare Allstate Ins. Co. v. Palterovich,* 653 F. Supp. 2d 1306, 1330 (S.D. Fla. 2009). The Florida statutory prejudgment interest rate is 11% annually (.0003014 daily) for 2007 and 2008; 8% (.0002192) for 2009;

Clerk is directed to enter judgment accordingly, deny any pending motions as moot, and close this case. Jurisdiction is reserved to tax costs.

**DONE AND ORDERED** this 1st day of February, 2010.

JAMES D. WHITTEMORE
**United States District Judge**

Copies to: Counsel of Record

---

and 6% (.0001644) for 2010. *See* Fla. Stat. §55.03; Florida Department of Financial Services, Statutory Interest Rates, and http://www.myfloridacfo.com/aadir/interest.htm (last visited Feb. 1, 2010).

[20] *See Ins. Co. of North America v. Lexow*, 937 F.2d 569, 572 n.4 (11th Cir. 1991) ("[I]n awarding postjudgment interest in a diversity case, a district court will apply the federal interest statute, 28 U.S.C. § 1961, rather than the state interest statute.").